IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Wanda Teresa McCormick, | ) | Civil Action  No. 5:14-4710-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court affirms the Commissioner's decision, as discussed herein.

I.    Relevant Background

A.    Procedural History

Plaintiff protectively applied for SSI benefits on August 25, 2011, alleging a disability-onset date of July 1, 2001.[1] Tr. 210-15. Plaintiff's claims were denied initially, Tr.121, 157-61, and on reconsideration, Tr. 137. Plaintiff requested a hearing before an administrative law judge ("ALJ"), Tr. 169-71, and a hearing was held on August 1, 2013, Tr. 29-70. In a decision dated September 27, 2013, the ALJ determined that Plaintiff was not disabled within the meaning of

---

[1] The SSI Application refers to an application date of September 12, 2011, Tr. 210; Plaintiff's protective filing date is August 25, 2011, *see* Tr. 284.

the Act. Tr. 9-23. On December 3, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. 1-5. On December 12, 2014, Plaintiff brought this action seeking judicial review of the Commissioner's decision. ECF No. 1.

B.     Plaintiff's Background

Plaintiff was born in July 1964, and was 47 years old on August 25, 2011, her protected filing date. *See* Tr. 284. The Disability Report – Field Office Form SSA-3367 indicates a disability onset date of July 1, 2002, which is one year later than the date on her SSI application. *Compare* Tr. 284 *with* Tr. 210. In her Disability Report – Adult Form SSA 3368, Plaintiff indicated she completed the 12th grade and did not attend special education classes. Tr. 290. However, at her administrative hearing Plaintiff testified that she completed only the ninth grade. Tr. 36. The Disability Report also indicates Plaintiff stopped working on July 1, 2002, due to her conditions of depression, borderline mental retardation, and heart problems. Tr. 289. In her Function Report-Adult completed October 11, 2011, Plaintiff indicated her back, legs, and arms hurt. *See* Tr. 296.

C.     Relevant Medical History

a.   Dr. Kathleen Lundvall

On November 3, 2011, Dr. Lundvall completed a Psychiatric Review Technique form ("PRTF") assessing Plaintiff's mental health. Tr. 504-15. Dr. Lundvall noted that Plaintiff met Listings 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. Tr. 504. Under the category of affective disorders Dr. Lundvall checked boxes indicating Plaintiff had depressive syndrome characterized by the following: anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, and difficulty concentrating or thinking. Tr. 507. Under the category of anxiety-related disorders she checked boxes indicating generalized

persistent anxiety accompanied by motor tension, autonomic hyperactivity, and apprehensive expectation. Tr. 509. Dr. Lundvall rated Plaintiff's functional limitations under the "B" criteria of the listings. Tr. 514. She determined Plaintiff had "marked" limitations in all areas which include restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, or pace; and she noted Plaintiff had three episodes decompensation of extended duration. *Id.* On October 31, 2012, Dr. Lundvall responded "yes" to a questionnaire asking if the November 2011 PRTF was still her opinion. Tr. 516.

### b.  Dr. Gariane Gunter

On February 26, 2013, Dr. Gunter completed a PRTF noting that Plaintiff met Listings 12.04 and 12.06. Under Listing 12.04 affective disorders, Dr. Gunter found that Plaintiff had the medically determinable impairment of depressive disorder NOS [not otherwise specified] that did not precisely satisfy the diagnostic criteria of the listing. Tr. 521. Under Listing 12.06 anxiety-related disorders, Dr. Gunter determined Plaintiff had anxiety disorder NOS, which was a medically determinable impairment that did not precisely satisfy the diagnostic criteria of the listing. Tr. 523. She noted that the symptoms and signs that substantiated the presence of the impairment included: "Recurrent & persistent anxiety that includes autonomic hyperactivity & apprehensive expectation." *Id.*   Under the "B" criteria of the listings Dr. Gunter opined that Plaintiff had "moderate" limitations in restriction of activities of daily living and "marked" limitations in the areas of difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace. Tr. 525. She noted Plaintiff had three episodes of decompensation of extended duration. *Id.* Under the "C" criteria of the listings Dr. Gunter indicated that Plaintiff had the following:

> [A] medically documented history of a chronic organic mental . . . disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychological support, and . . . [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

Tr. 526.

D.     The Administrative Proceedings

Plaintiff appeared, along with her counsel, at the August 1, 2013 administrative hearing held in Columbia, SC before ALJ Frances W. Williams. Tr. 29. At the hearing Plaintiff amended her onset date to her protected filing date of August 25, 2011. Tr. 32-33. Vocational Expert ("VE") Thomas D. Neal was also present and testified at the hearing. Tr. 29.

1.     Plaintiff's testimony

On the day of the hearing Plaintiff testified that she was 49 years old, 5 feet 7 inches tall, weighed 305 pounds, and lived in a trailer with her son, daughter, and two grandchildren ages seven months and six years old. Tr. 34. Plaintiff stated that the trailer had two sets of stairs, one with three steps and one with six steps and that it hurt her back and legs to use the stairs. Tr. 35. Plaintiff stated that she had an unrestricted driver's license and had no problems driving other than driving on the interstate because she did not "know how to get off and on too good." Tr. 35-36. Plaintiff testified that the highest grade she completed was the ninth grade, she was in adult education for a while, but did not obtain her GED because she could not pass the test. Tr. 36. Plaintiff testified that she did not receive Medicaid, did not have health insurance, and had not worked since 2001. Tr. 36-37. Plaintiff stated that she stopped working because she had "a bad car wreck and it messed [her] back and [her] neck up." Tr. 37. Plaintiff stated that she had not received unemployment benefits in the last several years and had not tried to find work. *Id.*

Plaintiff testified that she went to vocational rehabilitation one time and was told that she would not be allowed to work due to her conditions of "enlarged heart and [her] back and [her] legs, the way they are." *Id.* Plaintiff identified past work she had done in the late 1990s working part-time at a chicken farm and poultry plant. Tr. 38-40. Plaintiff testified that in 1998 she worked full-time at Wal-Mart for about six months, first as a cashier and then she was transferred to "'soft lines' where you hang up clothes and stuff." Tr. 41. She also worked part-time for short periods for the South Carolina Highway Department and for a limousine company. Tr. 41-42. The ALJ determined that the only past relevant work would have been Plaintiff's employment with Wal-Mart. Tr. 42-43.

In response to questions from her attorney Plaintiff testified that about ten years prior she had been psychiatrically committed to Lexington hospital.[2] Tr. 43. She also testified that at some point—she thought perhaps in 1999—she had counseling sessions at Newberry Mental Health. Tr. 44-45. Plaintiff testified that over the past four or five years she was receiving counseling at Lexington County Mental Health Center. Tr. 45. She was seen initially by Dr. Lundvall[3] and after Dr. Lundvall left the Center Plaintiff was assigned to Dr. Gunter. Tr. 45-46. Plaintiff stated that she has seen several counselors over the last two years as the counselors keep changing. Tr. 46. When asked to describe her symptoms Plaintiff stated that she "can't remember a lot and [her] nerves bother [her]." *Id.* Plaintiff stated that she has problems dealing with people and "likes to stay to [herself]" because of her nerves. Tr. 47. Plaintiff testified that she started feeling that way in 2000 when she was unable to obtain custody of her grandchildren. *Id.* Plaintiff

---

[2] Plaintiff's medical records indicate that on August 31, 2003, an application was made to have Plaintiff involuntarily committed for possible suicide attempt. Tr. 490-93. The commitment order was rescinded, and Plaintiff was discharged on September 2, 2003. Tr. 494. Doctors determined Plaintiff accidentally overdosed when she mixed alcohol with Vicoden and Seroquel. *Id.* Plaintiff denied suicidal ideation and stated "she has had a history of depression, but feels like she has been doing quite well." *Id.*

[3] Throughout the transcript Dr. Lundvall's name is misspelled phonetically as Lonvall.

testified that she is "tired all the time." Tr. 48. She also described an inability to keep track of small items about a half-inch in size because it is "blurry and stuff." Tr. 48-49. Plaintiff stated she could not relax much because of her back and legs hurting but she could not say if was due to pain or to a mental condition. Tr. 49. Plaintiff stated she did household chores "a little at a time" because of her back and legs. *Id.* She also stated that she has problems concentrating and "can't stay on one skill." Tr. 50. Plaintiff testified that she gets along with people and likes being with people but does not like being in a crowd. *Id.* Plaintiff testified that she has a fear of being raped and for years has had dreams of that fear. Tr. 50-51.

Plaintiff testified that she went to night school because she wanted to find a better job. Tr. 51. She also stated that she has trouble reading and sometimes is unable to understand the words she reads. *Id.* Plaintiff testified that she also has trouble with spelling. Tr. 52. Plaintiff testified that her back pain is "all the way up [her] spine, but it's mostly in the lower part of [her] back." *Id.* Plaintiff stated that the back pain started with a car accident. Tr. 53. She testified that she can walk or stand for about 10 to 20 minutes. *Id.* Plaintiff testified that she has swelling in her knees, legs, feet, and hands. *Id.* Plaintiff testified that she has problems lifting and can lift three-to-ten pounds. Tr. 54. She stated that she has muscle cramps in her legs and has pain "[j]ust about all the time." *Id.* Plaintiff stated she takes Altram, Neurontin, and Celebrex for the pain but she told doctors she could not take codeine and morphine.[4] Tr. 55.

In response to questions from the ALJ Plaintiff stated that she takes 600 milligrams of Neurontin three times a day and she takes the Altram three times a day. Tr. 55. Plaintiff testified that the side effect of the medication is weight gain, but that the medications help. Tr. 56. Plaintiff stated that doctors had not done any specific treatment for her back and legs other than prescribe medicine. *Id.* Plaintiff testified that doctors were going to send her for an MRI of her

---

[4] Treatment notes indicate Plaintiff is allergic to these medications. *See, e.g.*, Tr. 358.

back but because she did not have $100.00 they would not take her. *Id.* Plaintiff stated that doctors have not recommended any kind of physical therapy. *Id.* Plaintiff testified that she saw Dr. Lundvall and now Dr. Gunter about every three months and sees counselors every two-to-three weeks. Tr. 57. Plaintiff testified that her mental health was better but she could not tell when it started getting better. *Id.* The ALJ noted that in October 2011 Plaintiff stated that she cooked, washed dishes, cleaned, dusted, let the dogs out, and watched her four-year-old grandchild. *Id.* Plaintiff confirmed that was fairly representative of her activities and they were the same at present. Tr. 58. Plaintiff testified she was unable to care for her younger grandchild because she took too much medicine and now the older grandchild also went to a babysitter. *Id.* Plaintiff stated that she did not smoke and had stopped drinking alcohol a "couple of years ago." *Id.* Plaintiff stated that at one time she had a problem with alcohol but was able to stop on her own. Tr. 58-59. When asked if there was anything else she wanted to tell the ALJ, Plaintiff stated: "Nothing except that I hurt all over and my back and legs bothers me real bad, and my nerves." Tr. 59. In response to follow-up questions from her attorney Plaintiff testified that she is unable to cook, wash dishes, and clean for eight hours a day on a schedule and has to do it at her own pace. *Id.*

2.    The VE's testimony

VE Neal described Plaintiff's past work at Wal-Mart as cashier, Dictionary of Occupational Titles ["DOT"] number 211.462-010, light exertional level, SVP of 2, unskilled; and as sales attendant, DOT number 299.677-010, light exertional level, SVP of 2, and unskilled. Tr. 60.

The ALJ asked the VE to consider a person who could lift and carry 20 pounds occasionally and 10 pounds frequently; "[w]ho should not be required to climb ladders, ropes,

scaffolds, and other postural restrictions with no more than occasional stooping. . . . Occasional stooping, crouching, kneeling, balancing, crawling, or climbing stairs and ramps, and who would also be limited to unskilled work with no more than occasional direct interaction with the public, no more than occasional team-type interactional with co-workers. Additionally, should not be required to make complex detailed decisions, should not be required to adapt to greater than simple gradual changes in the workplace, should work in an environment where a supervisor is in the vicinity, not necessarily in the same room, but close by in the vicinity of the work area, and would require no reading at greater than a fifth grade level." Tr. 60-61. The VE testified that based on those limitations none of Plaintiff's past work would be applicable. Tr. 62. The VE identified a "reduced range of light unskilled work" that would be available. *Id.* Examples included: cleaner, DOT number 323.687-014, light, SVP of 2, unskilled, approximately 1,000 in South Carolina, 180,000 in the national economy; laundry garment bagger, DOT number 920.687-018, light, SVP of 1, lowest level of unskilled, 750 in South Carolina, 27,000 in the national economy; hand folder, DOT number 589.687-014, light, SVP of 2, unskilled, 550 in South Carolina, 55,000 in the national economy. Tr. 62-63.

The ALJ asked the VE to "assume all of those same abilities and limitations, but . . . add that the individual should not have concentrated exposure to extremes of temperatures or humidity . . . . And instead of occasional interaction with the public and team-type with co-workers . . . consider no interaction with the public and no team-type interaction with co-workers." Tr. 63. The VE testified that the "no contact with customers" limitation would not preclude the work he identified, but the "no team work, even on an occasional basis" would preclude all work. Tr. 63-64.

Plaintiff's counsel asked the VE if the three occupations he identified required a normal attention span. Tr. 64. The VE responded that "[i]f by 'normal' you mean that the individual is able to have attention and concentration for a two-hour period of time, yes, that's required." *Id.* Citing to a psychologist's report from 2003,[5] Plaintiff's counsel asked if an individual "in the bottom five percent of the United States in the ability to employ visual images and thinking and to process visual material efficiently" would be able to perform the jobs cited by the VE. Tr. 67-68.   The VE stated that he would have to ask the psychologist what was meant by processing visual or written images, but the VE opined that an individual in the fifth percentile would not be able to interact, interpret signage, read, or make judgments "so under those circumstances, obviously, they couldn't do any work." Tr. 68. The VE agreed with counsel that "an individual who does not have the ability to complete a normal workday and work week without interruptions from psychologically based symptoms and is not able to perform at a consistent pace without an unreasonable number in length of rest period, could not perform these occupations[.]" Tr. 68-69. Counsel asked if "any impairment in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances would preclude work in the three occupations[.]" Tr. 69. The VE responded that "if they can't perform a task for any given period of time, they obviously could not do any type of work." *Id.* Counsel asked the VE if he were to "combine the perceptual and motor limitations with a full scale IQ that is in the borderline range, would that further limit the individual's ability to perform the occupations" and the VE responded: "No, because they're unskilled." Tr. 70.

---

[5] On April 15, 2003, John B. Bradley, Ph.D., conducted a psychological evaluation of Plaintiff upon referral by the S.C. Department of Vocational Rehabilitation Disability Determination Section to determine Plaintiff's level of intellectual, academic, and social functioning.  Tr. 480-84.

II.     Discussion

A.     The ALJ's Findings

In her September 27, 2013, decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since August 25, 2011, the application date (20 CFR 416.971 *et seq*.).

2.     The claimant has the following severe impairments: mild osteophyte encroachment at C5/6, borderline intellectual disability, depressive disorder, anxiety disorder, and obesity (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform unskilled, light work as defined in 20 CFR 416. 967(b) except no lifting and/or carrying over 20 pounds occasionally and 10 pounds frequently; no climbing of ladders, ropes, or scaffolds; no more than occasional stooping, crouching, kneeling, balancing, crawling or climbing of stairs or ramps; with no more than occasional direct interaction with the public or "team-type" interaction with co-workers; no complex, detailed decisions; no requirement to adapt to more than simple, gradual changes in the work place; a supervisor in the vicinity; and no reading at greater than a 5th grade level.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on July 10, 1964 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since August 25, 2011, the date the application was filed (20 CFR 416.920(g)).

Tr. at 14-23.

B. Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that SSI benefits are available to individuals who otherwise satisfy certain criteria not at issue here and are "disabled," defined as being:

> . . .unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[6] (4) whether such impairment prevents claimant from performing past relevant work

---

[6] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and

("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

---

duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff asserts the ALJ (1) erred in her analysis of the treating physician opinions, (2) erred in her analysis of Plaintiff's credibility, (3) erred in her residual functional capacity

("RFC") determination, and (4) erred in her Step Five evaluation. Pl.'s Br. 1, ECF No. 14. The Commissioner submits that substantial evidence supports the ALJ's decision that Plaintiff was not disabled. Def.'s Br. 2, ECF No. 15.

1.     Treating Physicians' Opinions

Plaintiff asserts the ALJ made several errors in her analysis of the opinions of Dr. Lundvall and Dr. Gunter as it relates to the medical evidence.

Social Security Regulation 96-2p provides that if a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).

The Social Security Administration typically accords greater weight to the opinion of a claimant's treating medical sources, because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list:  (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654; 20 C.F.R. §

416.927(c). In reviewing the ALJ's treatment of Plaintiff's treating physicians, the court is focused on whether the ALJ's opinion is supported by substantial evidence. The court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

In her brief to the court Plaintiff argues that the "conclusions of Dr. Lundvall and Dr. Gunter are supported by their treatment notes." Pl.'s Br. 5. Plaintiff sets forth various test results and treatment notes from other psychologists and counselors and asserts that "[t]he point of all the discussion as to treatment notes is to demonstrate that Dr. Lundvall and Dr. Gunter treated Plaintiff in accordance with acceptable medical standards, which is the criterion for invoking the Treating Physician Rule." *Id.*

### a. Listing-Level Impairments

Plaintiff asserts the "ALJ erred in stating that no treating physician has found Listing level impairments." Pl.'s Br. 11. As noted by the Plaintiff, both of her treating psychiatrists found that she met two separate listings, Listing 12.04 and Listing 12.06. *Id.* The Commissioner argues that "it is clear from the ALJ's detailed and thorough discussion about the findings of Drs. Ludvall [sic] and Gunter (Tr. 18-20) that this was a mere scrivener's error that did not impact the ALJ's listing analysis." Def.'s Br. 15, n.4. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff's mental impairments do not meet or equal a listing. *Id.* at 11. Plaintiff counters that the ALJ's omission "is not a scrivener's error, but an error in analysis" noting that the ALJ cites only to State Agency doctors in support of her decision with no reference to Dr. Lundvall and Dr. Gunter. Pl.'s Reply 3, ECF No. 16.

Social Security regulations require that all medical opinions in a case be considered. 20 C.F.R. § 416.927(b). "Medical opinions are statements from physicians and psychologists or

other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions, but rather, are administrative findings reserved for the Commissioner. SSR 96-5p, 1996 WL 374183 at *2 (July 2, 1996). "However, opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner." *Id.* at *3.

At Step Three of the sequential evaluation process the ALJ determined that although Plaintiff had severe impairments, they did not meet the criteria of any listed impairment. Tr. 15. The ALJ went on to state the following:

> No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment.

*Id.* The ALJ then considered whether Plaintiff's mental impairments met the criteria of Listings 12.04 and 12.06. Based on the July 20, 2012 assessment by State agency psychologist Samuel Goots, Ph.D. and Plaintiff's 2011 Function Report, the ALJ determined that Plaintiff had no more than moderate limitations in activities of daily living; social functioning; and concentration, persistence or pace. Tr. 15-16 (citing exs. C5A and C8E, found at Tr. 128, 296). The ALJ also determined Plaintiff had experienced no episodes of decompensation, and the evidence failed to satisfy the paragraph "C" criteria of the listings. Tr. 16.

As noted by Plaintiff, the ALJ's statement that no treating physician had mentioned findings equal to the severity of the listings was error. However, the undersigned notes that in considering Plaintiff's RFC the ALJ discussed the PRTFs completed by Drs. Lundvall and Gunter, noting that both doctors indicated Plaintiff's depression and anxiety met Listings 12.04 and 12.06. Tr. 18. The ALJ gave little weight to these opinions finding that they are not supported by the doctors' "own treatment records, or of the overall documented evidence of record." *Id.* The ALJ found that "[d]espite their assessments of three episodes of decompensation of extended duration, the evidence does not document need for in-patient or other extensive or aggressive treatment of an episode of decompensation of extended duration." Tr. 19 (citing exs. C3F, C8F, C20F and C21F, treatment records of Drs. Lundvall and Gunter found at Tr. 368-409, 447-55, 527-36, and 537-43). The ALJ noted that Plaintiff was seen by the doctors "no more frequently than every 2-3 months, which does not support finding of marked or extreme mental difficulties." *Id.* Further, the ALJ noted that "[w]hile Dr. Gunter found 'marked' limitations, she found the claimant did not meet 'A' criteria for anxiety or depression and noted no other mental disorder." *Id.*

While the undersigned agrees with Plaintiff that the ALJ erred in stating no doctors found she met the criteria for a listing, this error is harmless as the ALJ, in making her listings analysis, properly evaluated the evidence as required by the regulations. *See* SSR 96-5p, 1996 WL 374183 at *2-3 (clarifying that while opinions from medical sources on issues reserved to the Commissioner must not be ignored, they are "never entitled to controlling weight or special significance"); *see Tanner v. Comm'r of Soc. Sec.,* 602 F. App'x. 95, 101 (4th Cir. 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of non-

disability"); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming the ALJ's decision when "there is no question but that he would have reached the same result notwithstanding his initial error").

### b. Frequency of Treatment

Plaintiff alleges the ALJ "erred in supporting her conclusion of nondisability on the ground that psychiatric visits were no more than every two or three months." Pl.'s Br. 11 (citing ALJ Decision at Tr. 19). As discussed in the previous section, in discussing Drs. Lundvall and Gunter's opinions the ALJ noted that Plaintiff's treatment records showed her to be stable on her "medication/counseling regimen" and she was seen by the doctors "no more frequently than every 2-3 months." Tr. 19. The ALJ made this observation in support of her determination that, with regard to meeting the criteria for a listing, that level of treatment did not support a "finding of marked or extreme mental difficulties." *Id.* The ALJ's decision that Plaintiff was not disabled since August 25, 2011, was not based simply on that one observation, but on her evaluation of the record under the five-step sequential evaluation process. *See* Tr. 14-23. This allegation of error by Plaintiff is without merit.

### c. Rejection of Opinions Based on Non-compliance

Plaintiff next alleges that the ALJ "erred in rejecting the treating psychiatrists in part because Plaintiff was not compliant with relaxation techniques and assertiveness skills, and had poor construction of boundaries." Pl.'s Br. 12 (citing ALJ Decision at Tr. 18-19).

The ALJ attributed little weight to the opinions of Dr. Lundvall and Dr. Gunter finding that their opinions were "not supported by their own treatment records, or of the overall documented evidence of record." Tr. 18. The ALJ noted that the treatment records "showed no worsening of the claimant's condition although she was not compliant with relaxation

techniques, assertiveness skills, and poor construction of boundaries; but show that she is stable on her medications and she continued to report that her medications were helping her." Tr. 18-19. The ALJ did not, as Plaintiff alleges, reject the doctors' opinions *because* Plaintiff was non-compliant. The ALJ found that *despite* Plaintiff's non-compliance the records showed that her condition was stable and not as severe as the opinions set forth in the doctors' PRTFs. This allegation of error by Plaintiff is also without merit.

### d.   Rejection of GAF Scores

Plaintiff argues the "ALJ erred in rejecting the GAFs of 50 on the ground that the new DSM V no longer has GAFs." Pl.'s Br. 14. Plaintiff references the ALJ's acknowledgment that the DSM V went into effect on July 1, 2013, and also notes that every treatment note scoring her GAF at 50 was prior to July 2013, and the ALJ's decision "was only issued in September 2013." *Id.*

Regarding her consideration of Plaintiff's GAF scores, the ALJ explained as follows:

I also note that throughout the record, treatment providers have documented global assessment of functioning (GAF) scores, which indicate severe limitations or symptoms. It is acknowledged that a GAF rating is a medical opinion as defined in 20 CFR §§ 404.1527(a)(2) and 416.927(a)(2). I therefore consider GAF scores with all of the relevant evidence in the case file and weigh a GAF rating as required by 20 CFR §§ 404.1527(a)(2), 416.927(a)(2), and SSR 06-03p, while keeping the following in mind: The GAF score is unlike most other opinion evidence we evaluate because it is a rating. As with other opinion evidence, a GAF score needs supporting evidence to be given much weight. By itself, the GAF score cannot be used to "raise" or "lower" someone's level of function, as the score is only a snapshot opinion about the level of functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

Therefore, following a review of the evidence of record, I give little weight to the scores given by the treating sources supporting the finding of disability, as the reasons behind each GAF score were not clearly explained. Moreover, I take administrative notice that the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, which became effective July 1, 2013, dropped the use of

the GAF for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.

Tr. 20. The ALJ did not reject Plaintiff's GAF scores because the new DSM V no longer uses GAF scores. The ALJ specifically stated that she gave little weight to the scores because "the reasons behind each GAF score were not clearly explained." Tr. 20. This allegation of error is meritless.

### e.   Failure to Follow Treating Physician Rule

Citing to 20 CFR § 404.1512(d), Plaintiff asserts that in rejecting the two treating sources the ALJ violated this regulation by failing to recontact her treating physician if she found the treating source's opinion insufficient.[7] Pl.'s Br. 14. Under the regulation the ALJ was required to "recontact medical sources '[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled.'" *McCoy v. Astrue*, No. CA 1:10-3139-RBH-SVH, 2012 WL 1015785, at *17 (D.S.C. Feb. 10, 2012) *report and recommendation adopted,* No. 1:10-CV-3139-RBH, 2012 WL 1015773 (D.S.C. Mar. 23, 2012) (citing to 20 C.F.R. § 404.1512(e)). Here, the ALJ confirmed at the administrative hearing that all documents pertaining to the case were received into evidence. Tr. 31-32. "The ALJ reviewed the evidence presented and did not conclude that the evidence was insufficient to render a disability determination. Consequently, it was unnecessary for [her] to recontact medical sources." *McCoy v. Astrue*, 2012 WL 1015785, at *17.

Plaintiff also appears to argue the ALJ erred in not giving controlling weight to the opinions of her treating physicians. The regulations provide that a treating source's opinion will

---

[7] Given that this case is a claim for SSI the proper regulation is 20 CFR § 416.912. This regulation was modified on February 23, 2012, and the requirement of the adjudicator to contact the treating physician was removed. 77 Fed. Reg. 10651 (Feb. 23, 2012). This modification occurred after Plaintiff's claim was filed and the regulation remains binding on the Commissioner.

be given controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2). However, the ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

As required by SSR 96-2p, the ALJ's decision contained specific reasons for the weight given to the opinions of Dr. Lundvall and Dr. Gunter. *See Mellon v. Astrue*, No. 4:08–2110–MBS, 2009 WL 2777653, at *13 (D.S.C. Aug. 31, 2009) ("[S]o long as the narrative opinion is sufficien[tl]y detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific findings on more subordinate issues . . . does not require reversal."). The ALJ determined the opinions were not supported by the treatment records and contrary to the doctors' opinions Plaintiff's treatment records showed that there was no worsening of Plaintiff's condition, that she was stable on her medication, and that there was no need for in-patient or other extensive treatment. Tr. 18-19. The undersigned finds that Plaintiff's allegation that the ALJ failed to properly consider the opinions of Dr. Lundvall and Dr. Gunter to be without merit.

The ALJ articulated sufficient reasons for assigning less-than-controlling weight to their opinions.

### 2. Credibility Determination

Plaintiff asserts the "ALJ erred in rejecting credibility by improper use of the two-part symptom test" because although the ALJ found that Plaintiff has an objective medical condition that could reasonably support some alleged symptoms, the ALJ "never explains which ones." Pl.'s Br. 17. Plaintiff also contends the ALJ did not comply with the mandatory discussion requirements of SSR 96-7p. *Id.* at 18. The Commissioner argues that substantial evidence supports the ALJ's credibility determination. Def.'s Br. 17-18.

 SSR 96-7p requires that prior to considering Plaintiff's subjective complaints the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints, including pain. *See* SSR 96-7p, 1996 WL 374186; *see also* 20 C.F.R. § 416.929; *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996). The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of her testimony and the record as a whole. This part of the ALJ's analysis requires her to weigh Plaintiff's complaints against "all the available evidence, including [Plaintiff's] medical history, medical signs, and laboratory findings," as well as "any objective medical evidence of pain" and "any other evidence related to the severity of the impairment, such as evidence of [Plaintiff's] daily activities, specific descriptions of the pain, and any

medical treatment taken to alleviate it." *Craig*, 76 F.3d at 595 (internal quotation marks and citations omitted).

If the ALJ rejects a claimant's testimony about a claimant's pain or physical condition, he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see Mickles v. Shalala*, 29 F.3d 918, 927 (4th Cir. 1994) ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers . . . .").

Here, the ALJ identified the applicable law and regulations with regard to assessing pain, symptoms, and credibility. Tr. 20. The ALJ determined that Plaintiff's mild osteophyte encroachment at C5/6, borderline intellectual disability, depressive disorder, anxiety disorder, and obesity were severe impairments that could be expected to cause some of the symptoms Plaintiff alleged.[8] Tr. 14, 21. *See Craig*, 76 F.3d at 591-96. In the first prong of the two-step pain and credibility analysis the ALJ discussed Plaintiff's hearing testimony describing her symptoms. *Id.* As noted by the ALJ, Plaintiff testified that she had attempted to secure a

---

[8] As noted by the Commissioner, "Plaintiff does not challenge any of the ALJ's findings with respect to her physical impairments." Def.'s Br. 3. Accordingly, this Order considers only those allegations of error relating to Plaintiff's mental impairments.

commercial driver's license but could not pass the test, she could not pass the tests for her GED, she was involved in a motor vehicle accident that affected her neck, she could not remember a lot and her nerves "bothered" her, she had problems dealing with people and liked to stay to herself, she could not relax because her back and legs hurt, she has problems reading and cannot spell well, she could stand and walk for only 10-15 minutes at a time, she could lift about three to ten pounds, she takes too much medication to watch her grandchildren, and she does household chores but at her own pace. Tr. 20-21. The ALJ noted that Plaintiff's obesity "may be considered a 'severe' impairment" but found there was "no evidence her obesity has resulted in cardiovascular complications, coronary artery disease, or pulmonary problems. There is no evidence her obesity significantly affects her ability to use her extremities or hands for fine manipulation." Tr. 21.  The ALJ determined, "[a]fter careful consideration of the evidence" that Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. *Id.*

At step two of the credibility analysis, continuing the analysis of Plaintiff's subjective complaints the ALJ found that the Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* In discussing the severity of Plaintiff's impairments at step two of the sequential evaluation process the ALJ described Plaintiff's self-reported ADLs as follows: "she makes her bed, washes the dishes, cooks a couple of times a week, dusts, cleans the bathroom, and does other household chores, watches television, takes care of the pets, reads, plays cards, takes care of a 4-year-old grandchild, walks, does grocery and household shopping, and drives." Tr. 15 (citing ex. C8E, Plaintiff's October 2011 Function Report-Adult). As part of her credibility

analysis the ALJ also discussed Plaintiff's allegations regarding her back pain and noted the absence of medical evidence showing problems with her lumbar spine. *Id.*

As required by SSR 96-7, the ALJ fully explained the reasons for partially discounting Plaintiff's subjective claims, including references to the record medical evidence. The ALJ noted the lack of objective medical evidence to support Plaintiff's allegation of an inability to work due to complications from obesity or back pain. Tr. 21. *See* 20 C.F.R. § 416.929 ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms . . . ."). Additionally, the ALJ considered other evidence in the record including the treatment notes of Plaintiff's treating and examining sources and "<u>credible</u> findings relating to any subjective symptoms." Tr. 22 (emphasis in original). The ALJ concluded that Plaintiff's "impairments do not preclude all work" and the RFC "is supported by the objective clinical findings, the reports of treating physicians, and the claimant's level of functioning." *Id.*

The court is to consider whether the Commissioner's decision is supported by substantial evidence and is free from legal error. *See* 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. The court has considered Plaintiff's challenges and has reviewed the record, including all records specifically referenced by Plaintiff in her brief. Based on this review and applicable law, the court finds the ALJ's credibility analysis is supported by substantial evidence and was sufficiently specific. The ALJ discussed the two-part test for evaluating pain and analyzed the entire case record. Tr. 20-22. Substantial evidence supports the ALJ's credibility determination. To the extent that Plaintiff attempts to point to selective records that may support her subjective complaints, the court may not substitute its judgment for the Commissioner's and finds that the ALJ's conclusions are within the bounds of the substantial evidence standard. *See Craig*, 76 F.3d

at 595 (stating that a claimant's subjective complaints of pain itself or its severity "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the [symptoms] the claimant alleges she suffers"); *Hunter v. Sullivan,* 993 at 35 (finding ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints).

Plaintiff's arguments do not convince the court that the ALJ's decision is erroneous or not based on substantial evidence. In the credibility analysis and other places in the decision, the ALJ addressed relevant evidence concerning Plaintiff's ADLs and their impact on her claims. *E.g.*, Tr. 15-16, 18, 20-21. Considering the ALJ's review of Plaintiff's ADLs in conjunction with the balance of her credibility determination, the court finds no error. The Commissioner's decision is supported by substantial evidence. *See Johnson v. Barnhart*, 434 F.3d at 658 (noting that a claimant's routine activities were inconsistent with her complaints); *Blalock v. Richardson*, 483 F.2d at 775 (indicating that even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence). Furthermore, the ALJ was able to observe the demeanor and determine the credibility of the claimant; "the ALJ's observations concerning these questions are given great weight." *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir. 1984). The credibility determination is supported by substantial evidence.

3.     RFC Determination

Plaintiff asserts the ALJ "erred by coming up with her RFC before she assessed credibility of symptoms." Pl.'s Br. 22. Plaintiff also alleges the ALJ failed to properly conduct a function-by-function assessment of Plaintiff's ability to do work-related activities. *See* Pl.'s Br. 23-25. As noted by Plaintiff in her Reply Brief, the Commissioner does not discuss whether the

ALJ conducted a function-by-function comparison of the RFC. Pl.'s Reply Br. 11. Plaintiff suggests that the ALJ's RFC "comes out of the blue." *Id.*

Social Security Ruling 96-8p provides that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." 1996 WL 374184, at *1. The functions listed in paragraphs (b), (c), and (d) of the regulations address different impairments and abilities. Paragraph (b) discusses physical abilities. Although ALJ discussed Plaintiff's physical limitations, as noted earlier, *see* n.8, that is not at issue in this case. Paragraph (d) discusses other types of impairments "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions [which] may cause limitations and restrictions which affect other work-related abilities." 20 C.F.R. § 416.945(d). That paragraph is also inapplicable here. Paragraph (c) provides that when assessing a Plaintiff's mental abilities the ALJ will "first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work." 20 C.F.R. § 416.945(c).

Social Security Ruling 96-8p requires:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform

> sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

1996 WL 374184, at *7. That Ruling further provides that "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id*. It is widely held that ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole).

Reviewing the record in this case as a whole, the undersigned finds the ALJ's determination is sufficiently detailed and is supported by substantial evidence. Contrary to Plaintiff's suggestion that the RFC came "out of the blue," the ALJ discussed claimant's RFC for several pages, Tr. 16-22, including prior ALJ determinations and the reports of State agency medical consultants, Tr. 19, 21. In a 2005 decision, ALJ Morgan found that Plaintiff had the RFC to perform unskilled, sedentary work. *See* Tr. 106. In a 2010 decision, ALJ Pope determined Plaintiff had the

RFC for limited light work and was capable of performing her PRW as a poultry worker. *See* Tr. 145,

149. On December 1, 2011, State agency consultant, Janet Boland, Ph.D., made the following

determination after conducting a Mental Residual Functional Capacity Assessment:

> Due to [claimant's] mental conditions documented on the PRTF, she may have
> difficulty sustaining her concentration and pace on complex tasks. However, she
> should be able to attend to and perform simple tasks without special supervision. She
> can attend work regularly, but may miss an occasional day due to her mental
> conditions. She can relate appropriately to supervisors and co-workers, however she
> may be better suited for jobs that do not require regular work with the general public.
> She can make simple work-related decisions and occupational adjustments, adhere to
> basic standards for hygiene and behavior, protect herself from normal work-place
> safety hazards and use public transportation.

Tr. 118. On July 20, 2012, State agency consultant Samuel Goots, Ph.D., made the following

determination on reconsideration of Plaintiff's claim:

> This claimant's mental condition is not currently of listing level severity but does
> impose moderate functional limitations without totally precluding work activities.
> She can understand, retain and follow simple instructions and can concentrate well
> enough to complete simple tasks with ordinary supervision. She would have
> moderate difficulty with more detailed instructions and complex tasks. She could
> complete a normal workweek with an occasional interruption due to her mental
> condition. She would function best in a work setting with limited contact with the
> general public and minimal interaction with coworkers and supervisors. She could
> avoid common, work-related hazards.

Tr. 134.

The ALJ identified Plaintiff's mental impairments of borderline intellectual disability,

depressive disorder, and anxiety disorder. Tr. 14. In her listings analysis the ALJ considered

Plaintiff's mental impairments under the "B" criteria of the listings but noted:

> The limitations identified in the "paragraph B" criteria are not a [RFC] assessment
> but are used to rate the severity of mental impairments at steps 2 and 3 of the
> sequential evaluation process. The mental [RFC] assessment used at steps 4 and 5 of
> the sequential evaluation process requires a more detailed assessment by itemizing
> various functions contained in the broad categories found in paragraph B of the adult
> mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).
> Therefore, the following [RFC] assessment reflects the degree of limitation I have
> found in the "paragraph B" mental function analysis.

Tr. 16.

The ALJ cited to treatment notes that documented Plaintiff "was able to complete daily tasks at home, including cooking and cleaning." Tr. 18 (citing to ex. C3F, treatment notes from Lexington County Mental Health Center). The treatment notes also indicated that in March 2012 Plaintiff "reported doing well with her medications, sleep was generally good, her mood fair, and she could not remember when she last took Restoril."[9] *Id.* The ALJ discussed, but gave little weight to, the opinions of Drs. Lundvall and Gunter set forth in their PRTFs. Tr. 18-19. The ALJ noted that while she "carefully considered these opinions and the decrease in GAF estimates, the actual treatment records show the claimant's condition to be quite stable on medication/counseling regimen." Tr. 19. The ALJ discussed Plaintiff's hearing testimony when she responded to questions by stating that her mental condition was better during the past couple of years and "she now testified that she likes people and gets along with people; she just does not like crowds." *Id.* Based on this testimony the ALJ did not find that ALJ Pope's "finding of 'no' work with the public or team-type interaction is currently supported." *Id.* The ALJ also considered other portions of Plaintiff's testimony indicating that she had trouble passing tests for a commercial driver's license and for the GED, she could not remember a lot and her nerves bothered her, she had problems dealing with people and liked to stay to herself, and that she had problems reading and cannot spell well. Tr. 20-21. The ALJ concluded that based on the "overall evidence" Plaintiff "would be limited to unskilled work with no more than direct interaction with the public or 'team-type' interaction with co-workers. No work involving complex, detailed decisions; no requirement to adapt to more than simple, gradual changes in the work place; a supervisor in the vicinity; and no reading at greater than a 5th grade level." Tr. 21.

In *Mascio v. Colvin,* 780 F.3d 632 (4th Cir. 2015), the court stated that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions,

---

[9] Restoril belongs to a group of drugs called benzodiazepines. Restoril is used to treat insomnia symptoms, such as trouble falling or staying asleep. *See* http://www.drugs.com/restoril.html (last visited Feb. 8, 2016).

despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* at 637. Here, unlike *Mascio,* the ALJ addressed conflicting evidence and the court is able to meaningfully review how the ALJ arrived at her conclusion.

As to Plaintiff's argument that the ALJ erred because she came up with her RFC before assessing the credibility of Plaintiff's symptoms, the court finds any such error to be harmless. *See Mascio* at 639. While the ALJ set forth her RFC determination at Step 4, *see* Tr. 16, the undersigned considers this to be a header for her discussion of the medical evidence and Plaintiff's symptoms. As indicated above, the court finds the ALJ properly analyzed Plaintiff's credibility. After making the credibility determination, the ALJ set forth her RFC assessment based on the "overall evidence." Tr. 21. Accordingly, Plaintiff's allegations of error regarding the RFC assessment are without merit.

### 4.    VE's Findings

Plaintiff's final argument is that the "ALJ erred in the Step 5 evaluation by ignoring the findings of the vocational expert." Pl.'s Br. 26. Plaintiff asserts the ALJ failed to resolve conflicts in the evidence resulting from Plaintiff's cross examination of the VE. *Id.* at 27. Plaintiff also faults the ALJ for not discussing the reports of psychologists Noelker and Bradley.[10] *Id.* at 29. The Commissioner asserts the ALJ properly relied on the VE's testimony. Def.'s Br. 20.

---

[10] The undersigned notes that the report of Dr. Noelker (made for Department of Social Services) was in November 2000 and the report of Dr. Bradley was in April 2003—both well outside of Plaintiff's current SSI filing date and amended alleged onset date of August 25, 2011. As noted by the ALJ, two prior ALJ decisions in 2005 and 2010 determined Plaintiff was not disabled and after the 2010 decision, aside from GAF scores, there was "no corresponding evidence of actual worsening in her condition as shown by her functioning, treatment, observations, or actual findings during mental health examinations." Tr. 19. The court is not considering these prior decisions as res judicata to Plaintiff's current claim. However, as the ALJ noted, as suggested by Plaintiff's response at the hearing to a question regarding the effectiveness of her medications, it appears "that her mental condition was better during the past couple of years, it appears that her condition has actually improved somewhat." *Id.*

"[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). Social Security Ruling 00–4p provides in pertinent part:

> When a VE or VS [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00–4p, 2000 WL 1898704, *4.

Plaintiff asserts that "there is no job in the DOT which has all of the mental limitations added by the ALJ to her RFC." Pl.'s Br. 26. Plaintiff contends the ALJ failed to explain how she resolved this conflict. *Id.* Plaintiff bases this alleged conflict on testimony she elicited from the VE on cross-examination related to the findings of the State agency doctors. *Id.* at 27. The Commissioner argues that "Plaintiff misconstrues the [VE's] testimony in stating that the state agency consultants' opinions precluded all work." Def.'s Br. 20. Plaintiff responds that the Commissioner has not met her burden of proof at Step Five. Pl.'s Br. 11-12.

The VE testified that an individual with the RFC described by the ALJ could perform work at the light, unskilled level and identified three jobs as examples. Tr. 62. The VE stated there were no conflicts with his testimony and the DOT. Tr. 63. On cross-examination Plaintiff asked the VE if he would "agree that any impairment in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances would preclude the three occupations?" Tr. 69. The VE qualified his answer by stating that "if they can't perform a task for any given period of time, they obviously could not do any type of work." *Id.* Plaintiff asserts that the findings of the State agency doctors who determined that Plaintiff would have moderate impairment in this area support an assumption "that 'moderate' constitutes 'any' limitation." Pl.'s Br. 27. The court disagrees. First, the VE did not agree categorically with Plaintiff's interpretation of the ability to perform the named occupations. Second, although the State agency consultants determined Plaintiff had moderate limitations, they also specifically stated that Plaintiff was capable of working. Dr. Boland stated Plaintiff "can attend work regularly, but may miss an occasional day due to her mental conditions." Tr. 118. Dr. Goots determined Plaintiff "could complete a normal workweek with an occasional interruption due to her mental condition." Tr. 134. Plaintiff's argument here is very similar to that posed by the plaintiff and found to be without merit in a recent Fourth Circuit opinion:

> For the first time on appeal, Ms. Tanner argues that the agency did not meet its burden of proof regarding her ability to perform alternative work, because the vocational expert concluded that, given her functional limitations, there were no jobs that she could perform. In so contending, however, Ms. Tanner overlooks the circumstance that the vocational expert only reached that conclusion upon questioning from her counsel, and that her counsel posed hypothetical questions that included severe functional limitations not supported by the medical evidence. Indeed, when the ALJ posed hypotheticals to the VE that set out all of Ms. Tanner's credible limitations, the VE responded that Ms. Tanner could perform the jobs of packer, assembler, marker pricer, sorter, and inspector.

*Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015). As the court found in *Tanner*, here the ALJ's hypothetical set out Plaintiff's credible limitations and the VE identified three jobs Plaintiff could perform. There is no apparent unresolved conflict between the VE's testimony and the DOT for the ALJ to address and seek an explanation. SSR 00-4p, 2000 WL 1898704 at *4 (finding that *if* the VE's evidence appears to conflict with the DOT, the ALJ will obtain a reasonable explanation for the apparent conflict) (emphasis added). *But cf.*, *Pearson v. Colvin*, No. 14-2255, 2015 WL 9204335, at *6 (4th Cir. Dec. 17, 2015) (finding that because the VE's testimony that the plaintiff could fulfill requirements of certain occupations apparently conflicted with the DOT the ALJ was required to elicit an explanation from the VE to resolve the apparent conflict).

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned finds that the Commissioner performed an adequate review of the whole record and that the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), the Commissioner's decision is affirmed.

IT IS SO ORDERED.

February 11, 2016                                        Kaymani D. West
Florence, South Carolina                                United States Magistrate Judge